Mr. Calderon, I think you're up first with 10 minutes. Afternoon, Your Honors. May it please the Court. Your Honors, for purposes of this oral argument, I'm going to be talking about the first two issues raised in our briefing, and then the remainder of the time will be yielded to Mr. As the Court is very aware, the linchpin of any conspiracy is that there must be an agreement between one person and another to go ahead and commit some unlawful act. In this case, the government was tasked with proving specifically that Dr. Nelson himself entered into an agreement with co-conspirators to go ahead and commit health care fraud. And Your Honor, as you've already indicated, you all addressed everything in the brief. To go ahead and summarize everything, they failed to meet their burden. They did not produce any sort of evidence whatsoever to indicate that there was any sort of agreement between Dr. Nelson, nor any of the co-conspirators, nor any of the witnesses that were actually named throughout this litigation, or who otherwise were called to testify in this case. How many co-conspirators fled guilty? I'm sorry, Your Honor? How many—excuse my voice—how many co-conspirators fled guilty? I believe, ultimately, there were at least four co-conspirators that did go ahead and plead guilty. One of them was Charlene Brandon, who was one of the hospice owners. Another one was Andre Kirkland, her brother, who was another hospice owner. I believe also there was Mr. Wendell Brandon, who was Charlene's son. And then there was also Sandra Livingston, another hospice owner. Those were the owners themselves. Now, as far as employees of the hospices go, there were also several other hospice employees that did go ahead and who ultimately pled guilty, whether it was in this case or in other unindicted cases or separately cases. Did those four people testify at trial, all four of them? I know they— They did have Ms. Brenda Douglas as well as Lynetta Douglas. They testified. They were both workers over there at one of the hospices. Then you also had Sandra Livingston, who was one of the other hospice owners. Then you also had Laura Thompson, who was a hospice worker. And then perhaps more pronounced was Ms. Annette Lofton. She was also one of the hospice owners that testified. And that's a very good point to go ahead and make and emphasize in this case, is that despite these witnesses that were called—and keep in mind, the government called 27 witnesses to go ahead and testify against Dr. Nelson. Not a single one discussed any sort of fraudulent activity, one, specifically as far as the inner workings of the hospices, but two, actually implicating Dr. Nelson in any sort of fraudulent conspiracy. As a matter of fact, testimony from Annette Lofton as well as the other hospice workers indicated that what they would do is they would go out, they would recruit patients who they believed would be hospice eligible, and then they would bring them to Dr. Nelson's clinic for a workup, in which case, if you assume that the government's position is accurate, they would then be certified. The key to all of this, Your Honors, is understanding that as far as all the information is concerned as to the conspiracy count, there is no insider information. That is something that is absolutely required by this court, is that when there is a lack of direct evidence to show that there is a conspiracy, you must have some sort of inferential information so that a jury can reasonably draw that inference that there was a conspiracy. Now here, the government relied pretty much on two different theories to try to establish that there was a conspiracy. One, they tried to assert a concert of actions theory. Well, Your Honors, as we just previously discussed, despite all the testimony from every worker as well as any other co-conspirator, there was nobody that implicated Dr. Nelson as far as these alleged false certifications. The second- Is he the only one that could certify a patient out of all of the cast of characters that you've mentioned? No, Your Honor, and that's the thing that I want to make sure that I point out for this court. It also ties in with the substantive counts themselves. The government's entire theory rested on the assumption that Dr. Nelson was the certifying physician. However, testimony that was produced at trial from every witness, both on the defense side as well as the government's own witnesses, indicated that there's always going to be more than one doctor's signature on the paperwork, specifically on the certification of terminal illness. With the way that it works as far as the certification, or CTI, is that there's always going to be one doctor who drafts the written narrative. That written narrative has to meet certain regulatory requirements, which states that a person does have what we call a terminal diagnosis, and that there's also indication of a prognosis that that person will pass away within six months if the underlying diagnosis runs its natural course if left untreated. In this situation, as conceded by the government, specifically its key witness investigator Mike Loggins, Dr. Nelson was never the certifying physician. He was never the physician that drafted the written narrative. In pretty much all but one of the patients, the person who drafted the written narrative was a Dr. James Warrington. I believe in the other outlier patient, that was a Dr. Kareem, who certified that patient as terminally ill. What would then happen at that point is that the medical documents, patient charts, as well as the certification of terminal illness, would then be given to Dr. Nelson, and he would review it to see whether or not it met the basic qualifications so that he could sign off on it as a second signature. Would he see the patients? No, Your Honor, and it's important to go ahead and note that under the regulations, he is not required to actually lay eyes on the patient. The regulations actually state that he can rely on the notes from his nurse practitioner, in this case, Ms. Gwen Williams, and that's another point that's worth noting for purposes of this court, is that in every single one of the patient records, they were always worked up by a nurse practitioner, mostly Ms. Gwen Williams, who was not called to testify by the government. I believe there was . . . I thought you said another doctor worked up the background information. With the way that it would work is that a nurse practitioner would do the HNP, which would be the health and physical examination of each and every single one of the patients. That's what happened with Dr. Nelson, right? That is correct, Your Honor. There would be the nurse practitioner that would review the paperwork, or I'm sorry, do that HNP, then turn that information over to another doctor. That first doctor would be the one who would draft that written narrative and then actually certify the patient as being terminally ill. The best way to think about it is that before it ever got to Dr. Nelson, it got to two people, one being the nurse practitioner, did the workup, and then there was the intermediary person, which would be Dr. Warrington, if not Dr. Kareem. They would be the ones who would actually draft that written narrative certifying the person as terminally ill, and then they would sign off as the certifying physician. Now, in the interest of time, going to the second issue, which are the substantive counts, that's another point that we need to emphasize with the court, is that there's nothing in the record to indicate that Dr. Nelson knowingly certified these patients as terminally ill. As the Fifth Circuit has already noted, especially in two key cases, the Noor decision as well as the Ganji decision, there's no requirement that a doctor actually has to lay eyes on a person. They can rely on what a person provides them, in this case a nurse practitioner, which leaves us with the other patients that the government would mostly rely on, which would be those patients that Dr. Nelson actually saw. Now, that being said, even though Dr. Nelson may have actually laid eyes on particular patients, the important thing to note is that for purposes of a substantive count of health care fraud, he has to knowingly certify them as terminally ill, when they're not in fact terminally ill. And it's important to note that under the regulatory guidelines, as well as common practice, the important thing that a doctor looks at is what is that patient's status at that particular time of certification, based on either one of two things. Either they're actually laying eyes on the person, or based on their reliance on medical notes and medical documentation, as provided in this situation by Nurse Practitioner Gwen Williams. How did he get to be director of so many hospices? He was requested. I mean, that's the most blunt way to go ahead and answer that question, Your Honor. He was asked to go ahead and be the medical director for all these various hospices by Charlene Brannon, if not Annette Loftin. As is noted, I believe, in the record by several people in the Mississippi Delta, there is a severe lack of medical care. There are not a lot of doctors providing medical services up there. However, in this situation, he was himself recruited to go ahead and serve as the medical director. And that's another point to go ahead and emphasize, Your Honors, is that in this situation, he was not the only medical director. In every single one of these hospices, there was at least two medical directors. Dr. Nelson was one. The other one was Dr. James Warrington. There was also a Dr. Kareem, and I believe in a few other instances there was a Dr. Brock or Dr. Clark that also served as a medical director for the various hospices. He was not the only medical director, Your Honor. That's important to go ahead and emphasize. Did the other ones get indicted too? I'm sorry, Your Honor? Did the other medical directors you're naming, did they get indicted also? They did not get indicted, Your Honor. That's a very important point to go ahead and emphasize, because if there was ever anybody who could go ahead and actually come forward in a case like this to provide insider information, whether it's regard to a conspiracy or knowledge that these people were not, in fact, terminally ill, then it would have been these other medical directors, if not these other doctors that are mentioned throughout the case. And like I said, that's something that's very important to go ahead and emphasize, that in this situation, it's not about how the patients were now. It's not about the fact that they are alive now. It's about how they were perceived then, when they were actually certified, assuming that Dr. Nelson was a certifying physician. And I see my time is up, and I will yield the floor to Mr. Mansour. Thank you, counsel. You've got five minutes for rebuttal. May I please record? It's my job today to address the issue of assessment of damages and actual and intended damages as it pertains to the sentencing in this case. My sincere hope that that's an issue that this court doesn't have to decide, as I truly believe that this case should be reversed on the merits of the conviction alone. But in the event it does, obviously, I will do to my client to address it. The issue has obviously been briefed, but one thing that's pretty clear, or was clear in this case, throughout this proof on damages, was that it was pretty much a moving target. You had the government take the position that because $16 million worth of claims were filed using Dr. Nelson's NPI number, that that should be the assessment amount. What it doesn't take into account is the over $10 million credit that was given, or recoupment that was given against that money. It doesn't take into a lot of things into account Dr. Nelson's number, proof showed in trial, NPI number was being used in cases for patients he was never associated with. The hospices were simply . . . they use his NPI number, they take it, they plug in anybody. They use any doctor who was on their medical staff. It just happened to be Dr. Nelson, they would use his number. Well . . . But didn't the district court effectively discount that? I mean, the district court ruled and reduced the amount . . . They attempted to, but it was . . . the numbers were so unclear, Your Honor, it was hard to assess because of the records we were able to get from Medicare and Medicaid, it was almost impossible to assess which ones were assigned to which claims. But even . . . What method would you use to make the appropriate assessment? I'm sorry? What method would you use to determine how much money is appropriate? They used a little over a million and they reduced that assessment down to a million and ended up with, I believe it was around $14 million. I think the question . . . I was going to ask the same question, I think. What is the mathematical resolution, the mathematical calculation that was performed by you or by some other expert on behalf of the defendant at the time of sentencing? What do you think the number should be, putting aside the validity of the conviction? Twofold. If you take our calculations and our expert testified that if you take the records and look at the ones that Dr. Nelson's name appeared on the certifications alone, and just with those, you're looking at about $935,000. That was our calculations on that. That does not give credit, does not account for the fact that many of those patients are deceased and were hospice eligible. In fact, all of them were attained a hospice eligible diagnosis, many of which are now deceased. Our assessment is that if you take that number, assess the actual correct diagnosis, then it should be zero, which is not unlike what the government found in its initial . . . not the government, but with the initial pretrial report or pretrial sentencing report in this case. Which was just the amount that he received in compensation from the hospices that were listed in the indictment. That's one option to take. That was in the precedent report that's dated in 2019, investigative report. Government agreed to that report. The point I'm making is there's so many different ways, and then, of course, if you take the . . . the Court's familiar now, because of the briefs, with the Banks decision. Banks drew a distinct distinction between actual damages and intended damages. The comments in the rules don't allow . . . the rules themselves don't discuss actual versus intended damage. It's the comment in the guidelines that . . . where we get the intended damage. This Court has always enforced that comment. I contend that it could easily be interpreted a different way. If you do, then there's really no proof of the actual damages, because it's virtually impossible to assess those claims. So we think at most $900,000, at the very least, zero, which would obviously affect . . . Okay. Thank you, Counsel. We'll hear from the government now. Mr. Dabbs. Thank you, Your Honor. May it please the Court, good afternoon. My name is Clay Dabbs. I'm a prosecutor in the Northern District of Mississippi. I worked on this case for a number of years before I was indicted. I presented it to the grand jury and tried the case with Kim Hampton, another AUSA Interim Officer, for better or worse. So I have my case and I'm familiar with it. Okay. How would you assess the amount of damages? So the amount that we presented was the total amount paid, $16,000,000, based on . . . But he was acquitted from some of those counts he wasn't convicted of. That was . . . we did not reduce it specifically by the acquitted defendants, which would be a relatively small amount. But the $16,000,000 was everything that was paid based on his . . . him being the referring physician, according to Medicare. And what Mr. McStore just mentioned, the $10,000,000 recoupment. So Genesis Hospice was at this for a long time. That's Charlene Brandon, 2005. She ended up owing Medicare something like $30,000,000. That money, she hit something called the caps, and Medicare started recouping money from her based on her new billings. And so for one provider number, they recouped $10,000,000. Now the problem with the defense argument is that when you look at the loss amount in this case, that provider number, it's only $600,000. So in the $16,000,000, it's only $600,000 from that provider number. So you can't lower it more than $600,000, if that makes sense. So the $10,000,000 doesn't apply to the $16,000,000. It's just the $600,000. And the district court, giving Dr. Nelson the benefit of the doubt, reduced the $16,000,000 by that number and also reduced the other recoupment figures that actually applied to the hospices in the schedule that added up to the restitution amount. That's where she got the $15,000,000 versus the $16,000,000, which was the total amount paid. What's the best case we can look at that supports the government's theory of unrestitution? I would say it started with the Hebron case and also the, I don't know if I'm saying it right, Mesquias case is also a hospice case, where this court found that the fraud, basically it was just a fraudulent business model, and everything Mount Build could be assigned as loss. And the burden shifts to the defendant to show, well, what are the legitimate claims? And what Agent Loggins explained at the sentencing hearing is that the live discharge rate for all of these hospices and for all of the patients associated with Dr. Nelson was well over 90%. So that means they're being discharged alive from hospice. When this started and it spread all over the Mississippi Delta, they were keeping the patients on too long, and so you'd have a patient that might be on hospice for two years, three years. Then they started bumping into the caps, Medicare started capping and evaluating the length of stay and recouping some of that money. So what the hospices did is they changed the way they operated, and they would get, you can see it in the medical records in this case, they would get discharge papers signed when the patient signed up. And then they could just discharge them when they needed to, to avoid this length of stay problem. Well, that creates a different issue, and that is live discharge. And so they end up being discharged alive, which if you're actually operating a real hospice, that should not be, I mean, it happens, it's not that it doesn't happen. But if it's happening to well over 90% of the patients, that does not make. How many years did this go on? Dr. Nelson started with Charlene Brennan in 2005. That's the earliest medical director contract that we admitted in terms of the 2005 to 2015. The bulk of that, those payments, was started in 2009 in terms of what was assigned to Dr. Nelson as sentencing. Why didn't Medicare figure it out? Well, that's a good, that's a good question. Medicare's not very good at that. You know, when you sign somebody up for hospice, you just get paid a rate, and they don't know anything other than what the provider is telling them, and there's no certificate of need in North Mississippi. There's no, I mean, basically anybody can open a hospice and get a billing number and they start billing, and some of the, it's very egregious, but Medicare doesn't know after the fact, they see these outliers, they see things like live discharge and length of stay, they start investigating it, and then, you know, years later, somebody gets prosecuted for it, but unfortunately, that's the way it works in a lot of fraud. So everything we're talking about now, just talking about restitution and the damages amount, the district court found that this was pervasive, right? So what we're talking about sort of feeds into that finding, correct, if I understand it right? And when there's a finding that this is pervasive, the burden then shifts, I mean, you sort of mentioned that. The defendant then has to come in and say, well, patient A, B, C, and D, they were legit, so they should come out of this overarching amount, correct? That's exactly right. Well, so these findings are reviewed for clear error, correct? That's right. And so the district court's in the best position to evaluate this, and I may not be remembering it right, but the $900,000 figure appeared in the briefs for the first time. That did not come up in the sentencing. The number at the sentencing was zero or $238,000. That was what the defendant offered. And so in addition to the proof of trial, Agent Loggins also testified regarding Charlene Brandon, who passed away before the trial. She pled guilty, but she passed away before we tried Dr. Nelson. Andre Kirkland owned a different hospice, her brother. He also died the same summer before we tried Dr. Nelson, so he added that information, and he explained the common theme of all of these hospices is you recruit patients door to door, you take them two, three, four, five at a time, not to their actual doctor, but you take them to the medical director, in this case, many times it was Dr. Nelson, and they get signed up for hospice, and then you send somebody to their house once a week to check their blood pressure. I mean, they're not hospice appropriate, and that was happening over and over and over again. Well, so let's . . . I'm sorry. I thought you were going to ask a question. Turn to the merits. So everything you're describing now, Dr. Nelson wasn't part of any of that, right? He wasn't driving the vans. He wasn't going door to door, and you heard Council Opposite's argument, and they discussed it in the briefing as well. What is the evidence that connects Dr. Nelson to an illicit conspiracy, an agreement to do all of this, to commit health care fraud? So we had three cooperators, Annette Loftin, who . . . that's Zion Hospice, Sandra Livingston, that's Milestone of Sandana, and Laura Thompson worked for Sandra Livingston. They pled guilty. Annette Loftin was indicted in this case. Sandra Livingston and Laura Thompson pled to informations prior to the trial. They explained that they took patients to Dr. Nelson, that they relied on Dr. Nelson to determine if these patients were hospice appropriate. Laura Thompson explained that she recruited people door to door. She took them to Dr. Nelson. At one point, Dr. Nelson refused to see a patient until the hospice paid his past due bills. So we had cooperators who testified specifically about their connection with Dr. Nelson. But that's . . . we took the patients to him. That doesn't exclude the possibility, does it, that he's sort of lax, he's negligent, he's a dupe maybe for the real conspirators. What ties him to the conspiracy to do this? Best evidence is the patients, and it's hard to overstate the impact of having somebody like Ernestine Tillman walk into court, sit down on the witness stand, and testify. You can talk to her for five minutes, you don't have to be a doctor, and you can tell that she's not terminally ill. Is she the one who drove from Oklahoma? That was Maisie Anderson. She got stuck in some weather and flew from Oklahoma. But Ernestine Tillman was picked up from her home near Clarksdale and driven to Cleveland, which is about 30, 40 minutes away, not to her doctor, but to Dr. Nelson. And she explained that she went to see Dr. Nelson. She remembered it. Now we know that she saw Dr. Nelson because Dr. Nelson billed Medicare for the visit. So we know the dates. He saw her. Ernestine Tillman testified. He did not say anything to me about hospice. Nothing about hospice. She thought it was something like home health. And she had had a stroke, but she still . . . she certainly was not terminally ill. She had a stroke in the 90s, and she explained that to the jury. And then within a couple of days of that visit, Dr. Nelson signed a certification, a physician's order, a prescription on his own prescription pad for her to have hospice. This is the one that said she was in a coma, had all these other effects from a stroke, etc. Answer me this, it's been curious. The nurse practitioner, Ms. Williams, what was her relationship to Dr. Nelson? Did they practice in the same clinic? She worked for Charlene Brandon. So she worked for the . . . it was Genesis Hospice, and then it turned into Haven, North Haven, Lyon, North Lyon. It was all the same thing. She just changed the name to avoid the Medicare caps. But Gwen Williams worked for Charlene Brandon. She did not work for Annette Loftin. She had nothing to do with Annette Loftin. She had nothing to do with Laura Thompson, nothing to do with Sandra Livingston. Dr. Warrington didn't work for Annette Loftin. He didn't work for Sandra Livingston or Laura Thompson. So she was a nurse practitioner that would go out and visit the patients. And certainly, fair enough, you could make the case, why didn't we charge her? That's the question that's in my mind. As well. That's fair enough. But I think that makes her guilty. It doesn't make Dr. Nelson innocent, because he did see these patients. He saw Eddie Mitchell, and Eddie Mitchell said, I thought I was going to see him for asthma. And Eddie Mitchell testified, and he's, you know . . . The bricklayer? That's Jimmy. That's Jimmy Brown. I'm sorry. I'm confusing my names. And Mr. Brown is 80 years old at the time of trial and still a bricklayer. Now, he did not see Dr. Nelson, but his wife, Marjorie Brown, did see Dr. Nelson. And of course, the defense argued, she was, I believe the jury acquitted on the individual count related to Marjorie Brown, that she was taken off of hospice after she saw Dr. Nelson. But again, he didn't talk to her about hospice at all. She explained that clearly. And these folks, you know, maybe they're older, but again, you can talk to them for five minutes in 2022 and know that they're not hospice appropriate. I'm still struggling, though. I mean, you heard counsel opposite mention that this need for insider information, these other doctors, somebody in Dr. Nelson's clinic tying him to these folks in an agreement to commit health care fraud. That's the conspiracy count. Where's that evidence? Well, I think if you look at the if you if you look at what a real hospice is, where you have patients dying, you have patients coming from naturally hospitals, nursing homes. There's a long course of treatment. They've seen specialists over and over again. They've had some kind of an accident. And then you go to hospitals. We've all experienced that. I would say it's common knowledge in our community that you've heard, OK, they've decided to put this person on hospice. We know what that means. When you look at what these hospices are doing, it's not anything remotely close to what a real hospice is. All right. So I get all that. But I mean, is it is it because he's the medical director of these hospices and he's seeing the patients? I mean, what is the it's a combination of all of those things. So it's it's the but are we piling inference on inference on inference that would be improper like the jury can't just infer and infer and infer and get to a conspiracy count. I do not think that's what we're doing to this day. They can infer, but they've got to have something from which to infer reasonably right. I think what we showed is that these hospitals were complete fraud and that Dr. Nelson was not just signing paperwork. He wasn't just getting paid or associated. He was directly involved seeing the patients. He was signing the documents and he was had a clear financial motive to do this. He was billing Medicare for the visits like it was a regular doctor's visit, which really the Medicare fee to the hospice is supposed to pay for the visit to the medical director. He's getting the hospices to pay the copay, sometimes in cash, and and he's doing this for nine different hospices, look 2013, nine different hospices at the same time, all of which are associated with fraud. And so the question is when you put all that together, it's not just one thing. You put, you know, in my experience, people don't sit down and say, hey, we're going to defraud Medicare. You know, you prove this circumstantially with the facts of the case. And in this situation, you have these hospices that are complete frauds and you have Dr. Nelson in the middle of it, not just for one hospice, but for numerous hospices over and over again. So I think that what repeatedly gets cited, you know, the difference in my view in the Ganji case is I understand it is there was no witnesses that testified at all about interacting with Dr. Ganji, sending patients to Dr. Ganji, doing anything with Dr. Ganji, just that she was being paid and that she referred patients. And certainly we proved that for Dr. Nelson, but we also proved that we were taking patients to Dr. Nelson. Dr. Nelson, he saw patients that clearly were not terminally ill in 2012. I mean, they certainly weren't in 2022. And they explained to the jury, you know, I was never been hospice appropriate that I'm aware of. And we had co-conspirators, unlike the Ganji case, who testified that they dealt with Dr. Nelson directly. And this isn't a situation where you have a real hospice that occasionally has a bad patient. The whole thing is a fraud. And I think the, I believe it's the Hergy case, if I'm saying, again, if I'm saying that right, that talks about how the, it was just a fraudulent business model. Everything about the situation was a fraud, and that's exactly what's going on here, and I think that's appropriate. The distinction that the court made in that case versus Ganji is exactly what we have in this case. And you have the jury makes those determinations about credibility, about, you know, inferences as to guilt or innocence in different facts and arguing about facts. And I would argue that this appeal is actually the same argument that was being made to the jury, and the jury rejected it, the district court rejected it. And I would also argue that this court should reject it as well. So, when you look at it in the light most favorable to avert, I also would add the minutes of meetings. So, there was an interview of Dr. Nelson in 2014, and after that interview, he went to have meetings with these hospices, and he gave us minutes. He gave them to us, the minutes that he said, here, look, I had these meetings with these hospices. Now, not in Dr. Nelson's mind, but it appeared that Dr. Nelson felt like he was helping himself by showing that he had these meetings. Again, viewing the evidence in the light most favorable to the verdict, you could argue that those, it's kind of like having a meeting and saying, we've got to stop robbing banks. It's an admission of the knowledge that he had, because in 2014, he's been doing this for nine years. It's not like he just started, and he's saying things like, hey, these patients need to know their own hospice. Well, that's just absurd that a patient wouldn't know or their family wouldn't know that they're on hospice. That doesn't make any sense. They've got to be told they're on hospice. We've got to start seeing these patients face-to-face. I'm not going to robo-sign anymore. I mean, in viewing the evidence- They left the patients in their home, right, on hospice, and just paid for them. They didn't institutionalize most of them. No, it was a, these hospices were at-home hospices. There are inpatient hospices. They're kind of like a nursing home hospital. That's not what these were. These were in-home. And they really weren't doing anything for them, other than checking on them and cleaning their house. But you can understand why they didn't know anything was being done for them. That's right. And they don't know, you know, Medicare's paying for it. They don't know until that, until something happens. And they go, like Dr. Patel explained, her patient, I believe, is Betty Fox. She found out that Betty Fox was on hospice because Medicare denied paying for some of her treatment. If you're on hospice, Medicare doesn't pay for your routine treatment, because you're supposed to be on hospice. And the payment to the hospice is supposed to cover it. Supposed to be dying, right? Exactly. And so she says, well, why in the world is Betty Fox on hospice? She shouldn't be on hospice. And that's how she found out that she was, because she denied. These patients, you know, if they have to go to the hospital, Eddie Mitchell, if I remember right, went to the hospital and they took him off of hospice, then he got out of the hospital and they put him back on hospice. So that's when they would, only time the patients would find out anything is going on. And since they've already signed the discharge papers, they can just drop them without doing anything else. So they can let them go to a certain point and then drop them. And when it comes to these forms, these are not forms that Medicare creates. These are forms that the hospice owners create. The certifications, the plan of care, and it was heavily litigated during the trial. There's a box that says certification of terminal illness and there are two lines and the doctor signed both lines. Now our experts said if two doctors sign it, they're both responsible for it. And so when they say, oh, he didn't certify any of these patients, what they're saying is he signed the right side of the box and not the left side of the box. And the jury rejected that because clearly, again, Charlene Brandon wanted them both to sign it. And Annette Loftin, in her medical records, there was no other doctor. It was just Dr. Nelson. And so the evidence supported the verdict and the burden, the loss was pervasive. The fraud was pervasive. The burden shifted to the defendant. The defendant did not offer a reasonable alternative or any alternative for amount of loss. Counsel, let me ask you one last question about amount of loss. If I understood you correctly, even though the amounts would have been relatively small, for example, do you believe that the amounts involved in the four counts for which he was acquitted for the four patients that are described in those accounts should not be part of the actual loss calculation? Seems like the answer is that they should not be, right? And if I understood you, you said, well, they are, but it's not a big amount. I think this is not something that I would argue about. I think you could make the argument that even acquitted conduct in the terms of the conspiracy, especially if you call it relevant conduct, could be included in the loss amount, the intended loss amount, but I do think that was included and I don't think we even address that with the district court, those patients. Okay. Thank you, counsel. Mr. Calderon, you have five minutes rebuttal. Please, the court. Just a few quick points. Ultimately, this case boiled down to a question of diagnosis versus prognosis and that was something that was very clearly distinguished and explained throughout the entirety of this trial. Diagnosis, what is the underlying condition? Prognosis is what is the expected life, what is the anticipated life expectancy if this disease or this underlying condition runs its natural course and is left untreated? That was something that every witness from the government as well as from the defense agreed on. It's all about prognosis versus diagnosis. As a matter of fact, in the record, there is no question that the underlying diagnosis were hospice appropriate. That was something that Wendy Gore testified. That was also something that I believe their witness, Mr. Paul Lawson, had testified to. When they got involved in this investigation, they actually requested all of the medical records. He had nurses. He had physicians. He had everybody look at every one of these medical records. And your honor, despite all these witnesses, nobody to this day has challenged the underlying diagnosis. It has gone unrebutted. Ms. Gore testified that every one of the diagnoses for every one of the patients listed in the indictment on the conspiracy as well as on the substantive counts, they all had a hospice appropriate diagnosis, which means that if they was all left untreated, they would be dead within six months. What it boils down to is that prognosis. What information was available to Dr. Nelson at the time that he made that prognosis, assuming that he actually was a certifying physician, as the government is wanting y'all to go ahead and define it. Here, all of the information was available to him through the medical charts. Every one of those medical charts has a valid hospice diagnosis. For example, counsel opposite talked about Ms. Betty Fox. She had congestive heart failure. That is over there in the medical records. And we would encourage the court, as y'all are reviewing the record, to look at those medical records as well. Ultimately, the other big theme about this situation is that the entire system is based on trust. Just like Mr. Dabbs mentioned earlier, and I believe Judge Clement, you mentioned how come Medicare didn't actually figure out this fraud. How come CMS didn't determine that there was fraud occurring from the get-go? Well, because it's a system that's based on trust. Ultimately, CMS, as well as the entire regulatory scheme, has to go ahead and rely on the information that is supplied to them by the individual hospices themselves. And it works the exact same way, even when you go ahead and start getting at a micro level with the individual hospices and the dynamic within their interdisciplinary team. The medical director has to rely on the information that is supplied to that medical director from nurse practitioners, as well as other nursing staff or medical staff, or information provided to that particular doctor. In this situation, nurse practitioner Gwen Williams, or another nurse, did the H&P, did the full workup, provided that information to the doctor who wrote the written narrative, and then signed as the certifying physician, as is required under the regulatory guidelines. That doctor, nine times out of ten, was Dr. James Warrington. At that point, Dr. Nelson's responsibility was to look at the documentation that was supplied to him, make sure that there was a valid diagnosis that was hospice appropriate, and see whether or not Dr. Warrington, the certifying physician, did go ahead and meet the formalities as far as putting down a prognosis of six months or less if the underlying condition is left untreated. And he met that obligation. He had no information in front of him to go ahead and indicate otherwise. The only thing that he could rely on, as was explained during trial, was the information that was supplied to him. In that manner, the state, or I'm sorry, the government, simply failed to go ahead and show that he was engaged in any sort of fraudulent conduct. Now, this would be a different situation, for example, if he saw a patient and then a day later, I'm sorry, he certified a patient as terminally ill, and then a day later he saw them walking across the street, healthy as can be. But that didn't happen here. Now, that happened in another case. I believe it was the Grant case that was cited in our brief. But all that Dr. Nelson could ultimately rely on in this situation was the information that was supplied to him through the medical records, and there are ample medical records, Your Honors. And like I said, those underlying diagnoses to this day are unchallenged. And with that, I yield the floor. All right. Thank you, Counsel. We appreciate your briefing in this case, as well as your remarks here today. The Court will consider the case submitted and render a decision in due course. Next case.